We will move to the final case on the argument calendar today, which is the Brnovich-Ramez case. And, again, just so we are we are clear, counsel, for the The state is going to have 20 minutes, the two interveners are going to have five minutes each, and the government is going to have 30 minutes. And whenever you are ready, counsel. Good morning. May it please the court. David Peters, on behalf of the United States of America. Sorry. The president issued the challenge executive order to address the acute threats posed to federal contracting by a once-in-a-century pandemic. The order does so by directing agencies to contract only with those entities that agree to comply with certain COVID-19 safety protocols. The order thus falls in the decades-long tradition of executive action, tamed by presidents of both parties and consistently upheld by courts, that advances the economy and efficiency of federal contracting. This court did not dispute that the order bears a close nexus to economy and efficiency, but mistakenly enjoined the order on other grounds. If I may, I'd like to start with the order's nexus to economy and efficiency. The order straightforwardly advanced the economy and efficiency of the federal government's procurement system by instructing agencies to contract only with those entities that adopt certain COVID-19 safety protocols, including vaccination. Having an order and instructing agencies only to do business with those that take steps to protect their employees from catching a virulent disease and passing that disease on to others straightforwardly advances the economy and efficiency of federal contracting. Counsel, is it the government's position that if something advances economy and efficiency, and factually that would be true at some level, that the major questions doctrine can never limit the president's authority under the Procurement Act to regulate the conduct of federal contractors? And if that's not the government's position, what's the dividing line? I think it is the case, Your Honor, that the major questions doctrine has no bearing in this context. It doesn't apply for several reasons. You know, for one, this isn't an exercise of an ancillary provision in some statute. This is a provision of the Procurement Act that's been a delegation of authority that presidents of both parties have exercised for decades. And oftentimes in ways that would hardly have passed Congress by, these orders routinely address the most pressing issues of the day. Well, I'm not sure that in 1961, when President Kennedy issued his order, people thought there was a major questions doctrine. So I'm not quite sure exactly how germane that is, for example. So again, I want to make sure I heard you correctly. It is the government's position that with regard to the Procurement Act and the president's authority, if the president has done something that promotes economy and or efficiency, the major questions doctrine is a non sequitur. I just think it's the case that the major questions doctrine or those principles don't apply when the president, as is the case when they're exercising authority under the Procurement Act, is exercising a delegation of authority pursuant to Congress's spending power to exercise its propriety authority on behalf of the United States. So it's the government's view that if Congress wants to limit the president's authority to act under the Procurement Act, then Congress has to say so. Congress has limited the president's authority on the Procurement Act. But if it wants to have specific limitations, it has to make that clear. That's the United States' position. I think that the scope of the president's authority in the Procurement Act, or what Congress intended for the scope of that authority to be, is evident from the language that Congress adopted. And the language Congress adopted in Section 121 is a broad grant of authority, and it exercised a delegated authority broadly for good reasons. The purpose of the Procurement Act was to give the president a direct role in governing the federal government's procurements activities. And so when Congress adopts a broad framing and delegates a broad framing, the authority that is exercised is broad. And we think that there are additional reasons why we wouldn't expect Congress to speak more clearly in this context. Again, it's important that this isn't an exercise of regulatory conduct. It isn't requiring anyone to do anything. It's a direction by the president to his own agencies of what they should do when folks elect to do business with the federal government. And this is also an area where the president has some inherent Article II authority. Now, we're not arguing that the order was justified in that ground, but we do think it's important as context to understand what Congress intended when it delegated authority in this context. You know, because the president's exercising proprietary authority, because the president has authority to direct agencies, we wouldn't expect Congress to speak more clearly than what it did in Section 121 in granting the president broad authority to direct agencies on how to engage with contractors. So you're right that the language in Section 121 is very broad. It talks about what the president considers necessary. So are there any limits to that? Yes, Your Honor. We would agree that the delegation authority is broad and that the president has a discretion to determine what orders are necessary to carry out this subtitle. But Section 101, which is another provision of the subtitle that the president is directed to carry out, gives context to what that delegation authority entails. Section 101 says, you know, the purpose of this statute is to ensure an economical and efficient system for procurement. And so as courts have understood and interpreted this provision, have understood Section 121 to require that any exercise of delegated authority the president considers necessary bears a close nexus to the statutory goals of economy and efficiency. So the Ninth Circuit has not determined the strength of the nexus required to hold an exercise of the presidential authority under the Procurement Act. And so what's the government's position about what the test for the nexus ought to be? We think the court's articulation, the D.C. Circuit's articulation of the test in Kahn should guide this court. The court there, sitting on Bonk, concluded that, you know, economical and efficient are broad terms, but this delegation of authority here is not unbound. And so, you know, looking at the statute as a whole, the relevant inquiry is whether the order that the president directed, you know, bears a close nexus to economy and efficiency. Whether the action that the president directed agencies to take will, there's a reasonable theory that it will advance the economy and efficiency of the federal procurement system as a whole. And this order falls well within that grant of authority, Your Honor. It, you know, ensures that the federal government's electing to do business with only those entities that have adopted safety protocols that many other private entities have determined were to advance their own economy and efficiency. And that's, again, consistent with other orders that presidents have enacted in the past. We would say, Your Honor, you know, to return, to expand a little further, it would be, presidents have consistently exercised their authority in this way. So, you know, the anti-discrimination orders of the 50s and 60s and 70s required those entities that wanted to contract with the federal government to ensure that minority workmen were included in the workforce, because presidents determined that that would advance the economy and efficiency of the federal procurement system. I mean, some of those orders had a defense nexus, right? The precise statutory basis of those orders, Your Honor, is not entirely clear. As the con court explained, at least some of those orders, the only authority could have been the Procurement Act. Yes. But, yes, you're right. There are some questions to the statutory authority there, but courts have considered that the Procurement Act is the authority for at least some of them. You know, Counsel, you may not be able to answer this next question. If you can't, I understand that. Is there anything in the next couple of months that you're aware of that could somehow render this case moot? Is there anything that you're aware of that could involve the withdrawal of the executive order? Your Honor, there is a limitation on how much I think I can say here. A few things. One is that after the mandate issued in the Georgia case in October of 2021, I'm sorry, October of 2022, excuse me, Your Honor, the OMB issued public guidance to agencies instructing them that they were reviewing this aspect of the task force guidance and that they instructed agencies not to enforce the mandate moving forward until that review had been completed. And they further instructed agencies not to include the mandate in any future solicitations or contracts. So this requirement is not currently being enforced. We have not argued in this case or anywhere else that OMB's determination moots this case because the review remains ongoing. Right. I have nothing further to share about the nature of the review. We would say, Your Honor, that it is quite plausible, depending on what that review turns up, that this case might be mooted by that determination. Right. Do you have any idea that you can share? And if you can't, that's fine. About when that might be completed? I don't have a timeframe, Your Honor, other than that the review is ongoing. Okay. Thank you. We don't, more broadly, we don't think that developments that have post-date the district court's decision should bear on this court's review of that decision. The standard that this court should apply is whether it was an abuse of discretion for the district court to enter a permanent injunction barring enforcement of the order when it did in January of 2022 and then it entered the injunction itself in February of 2022. And at the time, the district court made clear that the government still had a compelling interest in reducing the spread of, you know, once in a century pandemic. And we think for that reason, the district court erred in enjoining the executive order. But we would, you know. This may be mootness staying in front of this panel. I mean, I suspect you may have heard some of the earlier discussion. If, for whatever reason or whatever explanation, the order winds up being rescinded or terminated, is there anything left to this case for us to adjudicate? Your Honor, in a hypothetical where the order has been rescinded, I think there's a... And I understand you're saying it's not being enforced, but it's not terminated. It's not repealed. It's not rescinded. It's still there, and it may yet. And I understand the reason the government's proceeded the way it has. But at some point, is there an action the government could take in the not-so-distant future that would leave us with nothing to adjudicate? I do think it's correct, Your Honor, that were the order to be revoked, that that might be grounds to moot this case. I don't have anything more than that to say, but I think that would be a plausible... It's plausible that we would make that argument. We're not making that argument now because the order remains technically in place, even if it's not currently being enforced. No, and the panel understands the limits on what you're able to share with us. Thank you. I would say, I just want to return a moment to the history of the President's exercise of authority under this provision, because I think it's relevant that the position that the district court adopted about the scope of the President's authority would cast doubt on those orders. And it would suggest that the President lacks the authority to direct agencies to take steps to ensure that the contracts that they are entering into are performed economically and efficiently. And we would caution the court, or we would argue that the court should be hesitant about adopting an understanding of the President's authority that would suggest that Presidents for decades have misunderstood the scope of the authority, that courts have consistently... that courts who have upheld these orders have misunderstood the scope of the authority. And you've cited things like the various discrimination orders, the E-Verify order, which at least theoretically would be subject to the exact same kind of attack, had, for example, the Major Questions Doctrine been clearly enunciated at the time those orders were issued. I think that's right, Your Honor. The district court's reasoning, perhaps this order can be distinguished from those in some way, but the district court's reasoning and the reasoning of other courts that have addressed this order would cast serious doubt on those orders. And we would add just one more thing, Your Honor, in addition to the courts, is that the fact that Congress has, in light of those decisions, reenacted this provision without any material change, which was further indication that Congress was aware of these decisions and aware of these presidential exercises of authority, and nonetheless acquiesced in them by reenacting that provision without any substantive changes. One of the things I've struggled with here is the relationship, and the two parties have approached the cases differently in their brief, kind of highlighting my problem, the relationship between your argument, which starts with the text of the Procurement Act, and the argument that focuses on the Major Question Doctrine, the outlines of which are still, from the perspective of a lower court judge, yet to be determined. And I understand you've got broad arguments that push the Major Question Doctrine to the side, based on, for example, this isn't a regulatory activity. But in the end, they seem to circle back, because you also justified, to the extent that Major Questions applies here, you've got congressional authorization. Do you have a theoretical construct that helps me with the struggle I've just disclosed, based on the differing approaches of the two sides in this case? How would you put those two pieces together? I would direct the courts to the Supreme Court's decision in the CMS case. This is Biden v. Missouri, which concerned another vaccination mandate, this for Medicare and Medicaid recipients. There, the court upheld or determined that the states were unlikely to prevail on the merits of a challenge to that mandate, even though CMS had never required vaccine requirements of that nature before. And we think it's telling that the Supreme Court there relied or thought that the CMS's statutory authority, which were kind of general rulemaking and definitional provisions, were sufficient without any clear authorization. And one of the reasons we think that explains that decision is that there, like here, there was an exercise of the government's proprietary authority, because setting a condition on the receipt of Medicare and Medicaid funding isn't a regulation. It's not an exercise of Congress's commonest power. And where Congress delegates authority broadly in the spending context, we expect that they may speak in broad terms. And so I think, Your Honor, I think that helps explain why it's the case that when there are exercises of authority, like in the Procurement Act here or like in the CMS case, major question doctrine doesn't apply, even though, you know, in the CMS case, receipt of Medicare and Medicaid funding is a huge part of the economy. Right? It has a vast, vast scope. And yet still, the Supreme Court didn't think that anything clearer than the provisions that were required. So in part what the government's argument is, is we don't think the major questions doctrine applies at all. But if you disagree, there's a big difference, because here the government's spending its own money as opposed to generally regulating. Yes, Your Honor. I don't know that those are separate arguments. I think the reason the major question doctrine doesn't apply is because this isn't an exercise of regulatory authority pursuant to the commerce powers. This is an exercise of a delegation of spending authority in which the government is acting in its proprietary interests. And in those contexts, we expect Congress to delegate authority broadly, such that the major questions principles don't apply. Well, it strikes me the government's at least currently not a big fan of the major questions doctrine at all. But maybe that's neither here nor there. You don't have to respond. Go ahead. I just say, Your Honor, I think the font of authority matters. What the font of congressional authority matters, it matters that this is a delegation of authority in an area where the President has some inherent Article II authority. And we would point to the Gorsuch decision and Justice Gorsuch's decision in the Gundy case, where he suggested that a delegation of authority to the President where the President has some inherent authority need not raise constitutional issues in the same way that a delegation to an agency might where there aren't any inherent Article II authority. And doesn't Justice Gorsuch also talk about the accountability issues? You know, the reason to apply the major questions doctrine to agencies is because there is not the same inherent accountability concerns, or that there are accountability issues there that don't necessarily extend when you're talking about presidential authority. Yes, Your Honor, you anticipated my next point, which is that exactly. The President, this is a delegation of authority directly to the President. This is not a delegation to an agency. And as Justice Gorsuch suggests in his West Virginia concurrence, that part of, you know, part of the major questions principles are concerns about accountability. And there aren't any accountability concerns here where the delegation is to the most accountable individual, the government. And we think all of those taken together mean that major questions just don't apply because we don't think Congress wouldn't, we don't think there's any reason that Congress wouldn't delegate authority broadly here or that Congress would expect something clearer than what one section, what Section 121 actually provides, which is a broad grant of authority to allow the President to, as one sponsor of the bill said, you know, govern, not merely guide, federal procurement. I see that I'm running a little low on time. I'll just say one more thing. Well, you do have 11 minutes.  It's true, Your Honor. I apologize. But devise your time as you like. I just would, if possible, take a moment and address the scope argument, especially in light of the intervention of the Chamber of Commerce and Arizona Legislature. We think that, you know, at a minimum, the district court's injunction is overbroad here. The district court recognized that an injunction should only extend to those parties that have established injury that should be addressed through an injunction. And there just aren't any parties that have established injury that would suggest that the injunction should be applied beyond Arizona's own contract with the federal government. So there is no reason to apply this to private entities. And we would point out that, you know, although other courts of appeals have upheld injunctions, barring enforcement disorder, they have uniformly narrowed those injunctions to apply only to the parties that have established injury before the court and have rejected arguments for overbroad or broader injunctions that Arizona and now the Arizona Legislature have advocated for. So at a minimum, we think that the injunction is just overbroad. Well, this court has been in decisions with regard to so-called nationwide injunctions ambitious, sometimes even ambitious over my own preferences. In this case, we have now intervening at the stage of appeal, and how that plays out is still to be figured. But the Chamber of Commerce purports to represent entities which would claim injury even if they haven't been called upon to demonstrate that yet. What impact would that have on the scope of the injunction? I mean, should we say to the district court, okay, now go back at the Chamber of Commerce trying to get into the case and make them prove up the fact of injury? You're right. I think that the Chamber's intervention at this stage shouldn't – if the court was to vacate this – if the court was to vacate the injunction – uphold the merits but vacate the injunction and remand the district court to consider the scope argument, perhaps at that point it would be appropriate for the Chamber to maybe make a proof. But I don't think that their intervention at this stage on appeal would justify upholding the injunction for lots of the reasons that the Georgia opinion suggested, which is that even if the Chamber of Commerce purports to represent a vast group of individuals, the reason to avoid overbroad injunctions, including nationwide injunctions, is that different individuals have different responses to injunctions. But our court recognizes nationwide injunctions, which is why I say we've been ambitious. I think that the court recognizes that even when applying an injunction, there has to be an evidentiary showing that there was an injury being addressed. And there just isn't any showing at this stage that there has been an injury by the Chamber of Commerce or Chamber of Commerce members that would justify the application of the injunction beyond the Arizona's own kind of proprietary interest here. I see that I only have about seven minutes left. I'll listen to the questions. I reserve that time, given that there are several folks on the other side. All right. Thank you. Whenever you're ready, counsel. Good morning, Your Honors, and may it please the Court. My name is Alexander Samuels. I'm here on behalf of the State of Arizona and the Attorney General. In light of the changes last month in our position, I think it may be helpful for me to start by trying to clarify exactly what we think this case is about and what we think it's not about. From the State's perspective, this case is about a narrow question. It's about the Procurement Act, which was originally passed in 1949, and whether the language of that statute authorized President Biden in 2021 to issue the mandate at issue in this case. This case is not about a variety of other things. It's not about the constitutionality of vaccines. They're plainly constitutional. It's not about whether vaccine mandates are inherently legally suspect in any way. They're not. Mandates can often be legally enforced. And it's not about whether mandates are good policy. They may well be good policy in a lot of circumstances. The narrow question that we think is presented here is simply whether the statute that we're talking about authorized the President's action. Well, counsel, you know, Arizona certainly has the right to take whatever positions it wants. It may or may not have the right to refuse to answer questions from the court. But so my question is, notwithstanding what Arizona has said are its current positions, does Arizona believe that the major questions doctrine, as the district court found and as Arizona argued below, bars, exclusive of the other arguments that you're making, bars the President from doing what he did? And I'm just asking a yes or no question as to not whether it's trying to advance that, but does it believe the major questions doctrine bars the President's action? I think if I have to give you a yes or no to that, it's going to be a no. But I'd like to explain a little more. First of all, we think it's not at all necessary for this court to reach the question of whether the major questions doctrine applied. The Sixth Circuit made that clear in explicitly declining to reach this issue and in talking about how even under an ordinary standard, the President's actions here simply fail to fit within the text of the statute. Now, with that said, if the court feels that it is, you know, bound to reach the question of whether the major questions doctrine applies, the state does have real concerns about whether the major questions doctrine does apply in this context, and that is part of the reason we no longer urge it to this court. I think candidly that applying the major questions doctrine here would be an extension of the doctrine. As the government has pointed out, the doctrine has been applied very clearly by the Supreme Court in several instances, but always to agency action. And if you look at the key cases in this context, they talk specifically about agency action. Alabama Association of Realtors talks about, and this is the quote most often cited probably now, we expect Congress to speak clearly when authorizing an agency to exercise certain powers. West Virginia also talks about where the statute at issue is one that confers authority upon an administrative agency, and later talks about the agency at issue. And so, you know, while it may present interesting questions here, we think that that extension of the major questions doctrine is likely not warranted. And more importantly for our purposes here, we think it's just not necessary for this court to reach that question. Okay, so counsel, let me get to the argument that you're definitely advancing. Section 121 is very broad. It talks about policies and directors that the president considers necessary to carry out this subtitle. The president has extremely broad powers under Article 2. Section 101 talks about purposes to provide economical and efficient system for a variety of activities. Why doesn't the president have the authority to say this is in fact a once-in-a-century pandemic, millions or tens of millions of people have died, and we want federal contractors to promote efficiency and economy by doing their best to see that their employees are vaccinated? Why isn't that within the broad reach of a very broad statute and a very broad Article 2 powers of the president? Well, I think, Your Honor, I guess I'd like to make clear at the outset, we don't necessarily disagree all that much that the powers given the president or the Procurement Act do have some significant breadth to them. I think presidential actions from presidents of both parties over the course of decades have helped demonstrate that. I think court decisions over the course of decades have helped demonstrate that. But this court need not set that history aside or chart a different course in order to find that the vaccine-mandated issue here exceeded the president's authority. This mandate is different in several ways, and I would note that in deciding questions under the Procurement Act, other circuits, like Kahn in the D.C. Circuit and the Contractors Association case in the Third Circuit, have noted that the powers are broad here, but they are not unlimited. Kahn has some specific language in it and two concurrences to emphasize that while the actions at issue there were legal under the Procurement Act, that there was not a blank check. And Contractors Association talks specifically about how the actions at issue there targeted construction contracts, and thus were not writ large applications of the policy at issue. And so we think it is different here that this is in some ways a writ large application, or there is a writ large application. But it's not universal. It applies to federal contractors. So what are the limitations you think make this instance something that crosses the line? Well, I think this is fundamentally different from all of the prior applications in one significant way, or at least one significant way, which is that this fundamentally targets employee behavior rather than employer behavior. The prior acts of authority under the Procurement Act have mostly or exclusively targeted employers, those federal contractors who have contracts. But the people who do the work, the people who actually do the work for the contractors and whose actions in large part determine whether things are economical and efficient, are the employees, right? Undoubtedly so. But I think then, you know, Judge Desai asked a question about what standard should apply, and this Court has not necessarily decided that before. I think Kahn's close nexus test can work if there's some teeth given to the word close. And I think targeting the actions of employees rather than employers. Is that distinguishable from Chamber of Commerce v. Napolitano? Couldn't it be said that the requirement to use the E-Verify system required that employees were lawfully admitted in this country? It did, but employees wouldn't have necessarily been able to change at that point whether they were lawfully admitted in the country or not. It did not cause the employees to have to take any particular action. It caused the employer to have to take an action to determine the employee's status. So is it your position that an order that reduces absenteeism and illness in the workforce is not rationally related or substantially related to the efficiency of the workforce? Not at all. And I want to point out that in arguing that close nexus could be a viable test here, you know, there is some nexus here, I guess is one way to put it. We're not arguing that there's no nexus whatsoever to economy and efficiency here. Clearly, vaccination will affect absenteeism on one level, and absenteeism will relate to economy and efficiency. But if not given some teeth, this power, you know, it does not have any limits potentially. But I have some trouble with that argument because we are dealing with what I think the objective evidence demonstrates, but even if people could differ, there certainly is plenty of evidence to support the President's exercise of discretion in this area that this is a once-in-a-century pandemic where there are millions or tens of millions of people are dying. And the President's view is that for work that's essential and important for the federal government, if people are infecting others and dying and involving others in catching the disease, that it's not economical, it's not efficient. So I have trouble seeing that when you're talking about this close nexus, I have trouble seeing why that isn't here given the once-in-a-century pandemic. I can understand that question, Your Honor, and I certainly don't mean to suggest that these weren't very unusual circumstances and that the President might have had some authority in the context of addressing the pandemic, including under the Procurement Act, that he wouldn't have had outside the context of a pandemic. But there are many actions the President could take that would be, you know, would have some nexus to increasing economy and efficiency that I think even the government would agree would go too far. So, for example, imagine that there was a mandate put in place in federal contracts that all employees of federal contractors wear N95 masks in any close indoor gatherings with no distinction between those that are at work or away from work. Even at home in close indoor gatherings, employees are going to have to wear N95 masks. That would undoubtedly help decrease the number of infections, decrease the number of people who contract serious illnesses, decrease absenteeism, and accomplish many of the same things that we're talking about here. But when you're talking about trying to address employee behavior that is not exclusively work-anchored, I think that is not as close of a nexus as should be required. It seems to me the strength of that example is that it seems an overreach. But I'm not sure that the overreach is connected to the Procurement Act so much as the same reasons why you have difficulty visualizing any president that would actually make such a decree and purport to base it on the Procurement Act. In fact, it would be unusual for any president to make such a decree for lots of reasons separate and apart from the Procurement Act. I'm not sure I understand why it isn't a sufficient limitation, for example. I mean, in this case, the president didn't say that anybody, any entity that has a federal contract has to implement these restrictions on every aspect of its organization, including those having nothing to do with the federal contract. That might be harder to connect to the Procurement Act because you don't know what difference it would make. That works for me as an example of an overreach, but it's easy to come back and say, but in this case, the connection to the economy and efficiency for the government is easier to understand. So that there can be a bridge too far doesn't mean that there aren't bridges that get across the river posed by this case. I think that's right, Your Honor, but I do think in terms of, you know, to characterize it as overreach, I do think any potential overreach can and should be relevant in determining the closeness of the nexus, and I think that's where it can be relevant in this Court's analysis here. And I think it's also helpful on this front to look at not just prior Procurement Act jurisprudence, but also the Supreme Court's two opinions about other vaccine mandates last year and how it distinguished those mandates, upholding one and finding that one exceeded executive authority. So what makes this one closer to the one where it exceeded authority is distinguished from the Medicare-Medicaid case where it's got a tighter connection. Why doesn't this have a tighter connection because of the government federal contractor element? I think it is closer to the OSHA case, Your Honor. You know, if you look at the language in NFIB, which is the OSHA case, they talk about how the mandate was a significant encroachment into the lives and health of a vast number of employees. That's the case here. They put some emphasis on the fact that a vaccination could not be undone at the end of the workday and that in the context of the OSHA case, we were talking about what was going on in the workplace. I think that bears some similarity here. And I think if you look at some of the other language from that case, they talk about how no provision of that act addressed public health more generally, which falls outside of OSHA's area of expertise. Again, similar here. And the court there also noted that OSHA perhaps could have issued more targeted regulations and that the wide breadth was, it seems, relevant to the court's analysis there, that perhaps there could have been, I think the court talks about how there could have been mandates issued for particular folks like those working in research labs relating to viruses, things like that, and that some lesser measures could have been put into place. Again, I think similar here. Now, contrast that with Biden v. Missouri, which is the CMS case. That statutory delegation of authority was for the specific purpose of creating regulations that were addressed towards the health and safety of recipients of Medicare and Medicaid. Health and safety was squarely right at the center of it, and for that reason, the Supreme Court said that the application or the issuance of the mandate, there was a straightforward and predictable example of the types of power that could be exercised under there. The regulation of immigration or equal opportunity in hiring, would you say those are at the core of the Procurement Act? And yet activity aimed at those broader goals seem to have been found to be within the scope of the Procurement Act. Your Honor, I think what I would say about that is that the scope of the Procurement Act, you know, relates to what's going on in the workplace. It relates to the work that's being done. Those measures that we're talking about were broad, but they related to measures, they related to things like hiring, which are fundamentally work-anchored things. This, I think, is a broader thing than that, and I think goes further than the E-Verify case and the anti-discrimination measures. So you would distinguish, for example, the anti-discrimination orders, the E-Verify order, on the basis that here what the government is mandating can't be turned off when the employees leave, and in those cases it could be, and that's the way you would distinguish those? Well, I think you have to couple that with the fact that this is requiring specific action from the employees. I think that that perhaps is the bigger concern here, but I do think related to that, and this is, I think, taken directly from the Supreme Court's concerns in NFIB, the fact that it is something that there's not an on-off switch here. You either get vaccinated or you don't. It doesn't leave when you leave the workplace. I do think it's relevant here, and I think the Supreme Court says it's relevant under NFIB. If I could, Your Honor, I'd like to take a moment to address the questions about the scope of the injunction. Judge Clifton had asked questions about whether the Chamber's intervention here perhaps changes the calculus. I think it might. I want to explain our position here, which is, you know, we, pursuant to our February 14th letter, we are only defending a narrowed version of the injunction at this point. We think that consistent with the district court in the Fifth Circuit case and also the Eleventh and Sixth Circuit cases, that the injunction should only be applied to the parties, and we think that, you know, ordinary principles and broad principles relating to the propriety of injunctions dictate that. But the identities of the parties have changed here in the last week or two, and the Chamber of Commerce now is a party and now is seeking this relief, and so they may well be entitled to be covered or their members may well be entitled to be covered by the injunction. I don't think the fact that the Chamber of Commerce is now a party means that every private employer in Arizona is necessarily, should necessarily be covered by the injunction because many private employers are not seeking this relief here, and there may be reasons for them not to. Nobody is required to take advantage of any relief. They can impose their own requirements on their own employers as permitted by law. They certainly can. I'm forgetting which circuit it was. In one of the other oral arguments, one of the judges posed some questions about how, nonetheless, some federal contractors might want for this mandate to be in place. So, for example, if a contractor has a vaccine mandate but their employees work with a lot of other federal contractors, they might want the mandate in place so their employees are protected when working with these other federal contractors. Or there was a question posed in one place about whether some employers may want to impose a mandate but may like the cover that they get from the federal government if it's the government, you know, making them do it. You can imagine plausible scenarios where people might want it. I don't mean to suggest that everybody would, but I don't think it's this Court's place or the district court's place to issue a broad injunction that will affect those people who are not parties to this case. As to the mechanism for how the Chamber of Commerce or its members should be covered, I'll leave it to the Chamber to articulate, you know, what their interest is here. I do think it is likely the case that they have an interest that they can articulate that they should be covered. Whether a remand is required to fully flesh that out, I don't think we would take a position on. With that, Your Honors, if there are no further questions. Thank you, Counsel. Thank you. Good morning, Your Honors, and may it please the Court. Corey Langhopper for the Legislative Interveners. First, a housekeeping matter. Mr. Bailey for the Chamber has noted to me that because our clients are very similarly, not identically, but similarly situated, if some of the questions would also apply to him and it's sort of eating into the past five minutes, he wouldn't mind if the time would come out of his five minutes. I don't know if the Court will allow it, but I want to mention it to you. That's fine. Thank you. He would, I think, like to have at least a couple of minutes, and so, of course, I'll try to leave that for him. There's really two issues, I guess, I wanted to talk about as I'm here, and the first is the scope of the injunction. And our view of this is, of course, different from the Attorney General's. How to shape an injunction is fundamentally an equitable question. It's an equitable remedy. And so I want to articulate the principles, the facts that Judge Liberti was looking at and entitled to look at in granting a statewide injunction. The first, of course, is that Arizona, as Judge Liberti and the Sixth Circuit found for the plaintiffs there, is suffering a sovereign injury. It is traditionally responsible for exercising the police powers, including the vaccine mandates, over its citizens. And it has traditionally had a certain role relative to the federal government in exercising those powers. Is this argument in some way dependent on a parent's patriae theory? I don't believe so, Your Honor. Okay. No, this is not an injury to the citizens. This is an injury to the power of the state to exercise this. That will always happen when the federal government exercises its authority in a way that is inconsistent with what the state itself would do. But that's unremarkable. I mean, in the Procurement Act, the activities which all parties would seem to agree are appropriate for the federal government to exercise, or those in the courts in the past have said are appropriate for the government to exercise, may be inconsistent with what the state of Arizona might want to do, but the state of Arizona's traditional police power does not trump the authority of the federal government. So I'm not sure I understand exactly what you're getting to here. I do think there's not a limit to the idea that Your Honor just articulated. And that manifests in part in the major questions doctrine, right? So if we're looking at, for example, the Alabama Realtors Association case, the Supreme Court there recognized that it was encroaching onto the traditional domain of state authorities to regulate housing matters, you know, the payment of rent. And where that happens, where you – certainly federal contracting is a federal issue, but if the federal contracting authority ends up transgressing the traditional domain of states, federalist relationships. All right, well, let me ask you a question on that. For example, President Kennedy's 1961 EO, anti-discrimination, was before the passage of the 64 Civil Rights Act. Would the major questions doctrine basically invalidate President Kennedy's order for the same reason you think the major questions doctrine invalidates President Biden's order? I do think it's difficult to reconcile the major questions doctrine, as it's recently been developed and articulated, with the orders that were decades in the past under the Procurement Act. So the discrimination orders, for example, of President Kennedy, President Eisenhower, putting aside the war powers justification, that would be problematic. President Bush's e-verify lawful immigration status similarly? Certainly those issues aren't before us, but I do think they're difficult to reconcile. I don't think Your Honor actually needs to reach the major questions doctrine issue, though. And that's because I have, I think it's fair to say, a third view of the text of the Procurement Act. I don't think you need – if you reach it, of course, the Sixth Circuit analysis we think is the best, but we've talked quite a bit this morning about Section 101 and 121. And our view is that the other arguments you've heard are essentially mixing and matching phrases from two different statutes to justify a statement, a delegation of authority that Congress never agreed to. So what they're doing specifically is taking the description of the President's authority to exercise, to act as he deems necessary in 121, then adding – Carry out the subtitle. I'm sorry? Necessary to carry out the subtitle. Correct. So they're dropping the subtitle part, they're taking the necessary idea, and then they're combining that with the economy and efficiency idea from 101 and saying, there you go. He can do what he thinks is necessary to be economical and efficient. That's an extremely broad reading. I'll note that I'm at the end of my time, Your Honor. So it's an extremely broad reading that Congress never agreed to. Those are separate provisions. So basically you're arguing that the anti-discrimination provisions that Judge Bennett just outlined, the E-Verify provisions that President Bush imposed, those are all out under your reading of the Procurement Act? I think what – Yes or no? Are they out or not? Your Honor, I wish I could offer you a more developed view of that. Well, I'm having trouble understanding the argument you're trying to make here, that you're saying that the President's broad authority under 121 doesn't apply to the purposes of the act as outlined in 101, which have been applied in other courts to things like the Anti-Discrimination Act or E-Verify. Are you basically saying all that's wrong, that none of that is properly justified under the President's power of the Procurement Act? If you don't accept the Attorney General's distinction that those regulations are permissible because they focus on the employer, if you don't accept that, then I think it's difficult to reconcile those with the text of the statute and the major questions doctrine. How do you respond to the government's position that Congress continues to reenact the Procurement Act provision post all of these cases that Judge Clifton just recited to you? There has never been a purported exercise of authority under the Procurement Act that was nearly as sweeping and consequential. Oh, I think the anti-discrimination at that time had a much more substantial impact. I mean, if you go back, I'm afraid I was alive then in the 1950s when President Eisenhower, 1961 President Kennedy, those were fighting words for a large portion of this country. Congress did not respond to that by saying the President couldn't do that. The economic impact of this order, about 20 percent of the American workforce, 33 million people, which as far as I can tell is about 20 times the size of the military. That is a much broader claim of power under the Procurement Act than what we have seen previously. It also transgresses into the area of vaccine mandates and the health and safety of citizens, traditional police powers, which have not been claimed under the Procurement Act before. And respectfully, we don't think Congress ever would have authorized that. Did you want to leave the rest of your time for your friend? Yes, thank you. All right. So we will go ahead and put five minutes on your clock. Thank you, Your Honor. I don't know that I will need it. We're always happy to take time back. Brevity is you know what. Good to be here and appreciate it. Michael G. Bailey on behalf of the Arizona Chamber of Commerce. May it please the Court. I do want to notify the Court at the start that my application for admission to the Ninth Circuit is pending. We've taken care of that. Okay, so I can speak. Thank you. I wanted to just make a few comments on the scope of the remedy. First, with respect to the general scope of the geographical jurisdiction of the district court being appropriate, as Judge Clifton started to reference during the government's argument earlier, this Court is well-traveled in figuring out what the scope of an injunction should be in cases like this, where we have, assuming, you know, a finding on the merits of the substance, that we have an unauthorized federal action of broad application that in no way in this case and the other cases is limited to there's no argument at the trial court that these plaintiffs and these plaintiffs only in its application are offended, but the action is simply unauthorized by the law. The court within its discretion, the trial court, has the equitable power and discretionary. It's a prudential issue. Well, how is the private employer in Arizona different from state government contracts in New Mexico or Nevada? We're in Nevada now. The state surely in Nevada has contracts with the federal government, and the determination by the district court in Arizona would logically apply to those two, but the injunction doesn't spread that far. I'd suspect that the arguments may be more applicable to state government contracts in Nevada than they are to private employer contracts in Arizona, so why draw the line there? Well, I think the courts have discovered, again, it's prudential, but there's a good argument for letting the courts, letting the different circuits develop the argument, and that's what this court has done when it has found the record. That's why it switched to Nevada. New Mexico is not us, but Nevada is, so okay. Sure, Nevada, but this court has done that when it's looked at, it's recognized there are arguments against the broad application of an individual court order. I know that the Attorney General, the previous version of the Attorney General's office didn't go on at length about this, but they referenced the court's history in limiting national injunctions where the record's not developed, and in the case cited, which is City and County of San Francisco, it was a Northern District, California case, and a national injunction was ordered, but this court said we're going to limit it to California. Now, you did, in that case, go across all four districts in California. In another case, East Bay Sanctuary, similar issues, same central thing, though, is that there's no argument conceivable that this unauthorized action by the government could apply to some different plaintiff as opposed to the one that's in front of us. You withdrew the national injunction and applied it across the Ninth Circuit, but the point is that the court considered there is value in letting other jurisdictions examine the question as we're figuring this out, but there's no value in having the same jurisdiction figure it out repeatedly. So I think it's appropriate, but regardless, again, if the court finds on the merits with respect to the chamber and its members, just a few quick arguments. I apologize because I see the time's going, but first of all, I think the federal government, I'd argue the federal government waived the limitation to not include the chamber, but when they did not object to our intervention in this case, I understand that a significantly predictable interest, which is a standard that we would show in intervention, Well, is the Chamber of Commerce of Arizona a federal contractor? Its members are, Your Honor. But is the chamber? So its members, there's been no showing, actually, of the kind that's usually required, particularly in trial court, of how the members are affected. It's not hard for me to guess that the chamber has members who are affected, but we're kind of in uncharted territory. Just like there's no rule of federal procedure that speaks to intervention on appeal, it just kind of happens, and there are reasons why we decide to let it happen, but it's hard to figure out what the impact is at the trial level. Should we send this back to the trial court and let it figure it out? I understand that. A few options, I would argue, Your Honor. First of all, again, I think the federal government waived the argument that we're not covered, but secondly, as they referenced in not objecting to our intervention, we certainly could file a declaration with respect to the status of our membership. I think the court, frankly, could take notice, you know, just to the timing of the contractor's mandate itself. The law requires that the conduct of a business in establishing a mandate, and they all, of course, did because of the mandate at some point, is based on anything traceable to government action, and there was no, it was all concurrent. Sometimes we cut corners to be practical, and I get that. I think that's why the government didn't oppose the chamber's intervention on appeal. On the other hand, since at this time the government's not enforcing the mandate, not insisting that it be included in contracts, I'm not sure it makes a lot of difference as between letting us leave it in place and having the district court do the kind of, require the kind of showing that's customarily required to cover by injunction or to permit an organization to intervene. So I'm going to be dancing on the head of a pin here in theory, but is there any real practical difference that's going to be made? Your Honor, I agree with you completely and would only argue that that's good cause to leave the injunction in place as it is because there's no practical difference. All right, thank you. Thank you. All right, the government has some time for rebuttal. Thank you. I'd like to start where the legislature left off. So this is not some, the President's exercise of authority under Section 121 is not mishing and mashing statutes together in some inappropriate way. Section 121 broadly authorizes the President to prescribe policies and directives he considers necessary to carry out this subtitle. This subtitle includes Section 101, which is the statement of purpose. And so as the Gundy opinion makes clear, it's entirely appropriate to construe the scope, the broad scope of authority under 121 by reference to Section 101. And that's how presidents of both parties have understood this provision for decades and how courts have consistently understood this provision. I'd also like to say I think it's telling that the legislature was unable to kind of explain away decades of orders that have operated in this exact way, whether under the legislature's understanding of the statutory grant of authority or the major questions doctrines. They suggest that orders that presidents of both parties have issued, that courts have consistently upheld, would be at issue and in question. I think they were candid in their answer, and we appreciate candor. I mean, whether that helps them on the merits is a different question, but I think they gave a candid answer to a question that the panel was concerned about and that the government had highlighted. Of course, I just think it's telling, Your Honor, that the attempt to distinguish away those orders is just very difficult, that this order is consistent with those orders and that it is an exercise of authority designed to improve the economy and efficiency of the federal procurement system by improving the economy and efficiency of the performance of the contracts that the federal government enters into. What would the government's response be to the argument that there is a difference because theoretically at least those prior orders in some way stop at the workplace door while this doesn't because you can't turn a vaccine on and off? Your Honor, we are not aware of past orders that have required vaccination. That does distinguish this order from other past orders in some respects, but we think that this order is still expressly work-anchored in that it applies only to those contractors or covered contractors that are either working on federal contracts or working in workplaces where federal contracting work is being done. And so we think that it's still expressly work-anchored in a way that is a sufficiently close nexus to the economy and efficiency kind of analysis. I would also like to say again to the scope argument that the government did not waive the application or consent to the injunction applying to the Chamber of Commerce and its members by not opposing intervention on appeal. Being a party to an action is not entitled the party to relief. The party must still establish that it's entitled to injunctive relief by showing that it suffers article of harm and that would be redressable by the injunction. And there's just no showing that the Chamber of Commerce or any of its individual members have made such a showing. I'll put the same question to you. Is this anything more than theoretical at this point? The government's not enforcing the requirement. It's true that the government's not enforcing, so there may not be a present – it's not currently being enforced against any of the Chamber of Commerce members because it's not being enforced broadly. I still think it poses a problem to affirm the district court's scope of the injunction based on the intervention without any showing that the members have actually established harm. Do you have any doubt that the Chamber has members that would qualify, could make the necessary showing? I'm not saying that we should dispense with the requirement just because of that, but the reality is that it's not hard to surmise that the Arizona Chamber has members who are federal contractors. There might be members, individual members, who could make that showing, but it's ultimately the burden on the parties seeking an injunction to make that showing, and there just isn't any showing here. So what would you say to the legislature's distinction that it impairs state sovereignty I think that's wrong too, Your Honor, for the reasons we explained in our brief. The sovereign injury might be grounds for standing in an injunction, but there has to be – like all requests for injunction has to be showing irreparable harm and that there's actually a conflict, a concrete injury here that needs to be addressed by an injunction, and kind of broadly averring to – police powers won't do that. There has to be actually a concrete injury, and there just isn't that here, Your Honor, as we point out in our brief, Arizona law permits private contractors to require vaccinations so long as they're in a religious accommodation. I believe that's ARS 23-206, and so there just isn't any conflict at all with Arizona law of applying the vaccination requirement to private contractors because Arizona law contemplates that. And so there isn't any infringement on the sovereign injury because Arizona law permits precisely what the mandate requires. And in absence of some kind of showing of concrete injury or concrete conflict with the exercise of that sovereign authority, the expansion of the injunction beyond Arizona's own contract to the federal government would be improper. And then just lastly, Your Honor, to return to the major questions doctrine, the scope of an order does not trigger major questions doctrines on its own. We know that from the CMS case. There, too, there was something that had a broad impact, and yet the court didn't think major question doctrine were implicated. What matters is whether there's a delegation of authority to an agency. It's ultimately a matter of congressional intent. And whereas here there is a delegation of proprietary authority to the most accountable elected official in the country who has some inherent Article II authority in this area, we wouldn't expect that Congress intended or would require anything more than a broad delegation like Section 121 to authorize an order like this, which is, again, confirmed by the fact that Congress has consistently reenacted this provision when presidents have exercised this kind of authority in other contexts. And so for that reason, we think that the injunction should be vacated. All right. We thank counsel for their arguments. The case just argued is submitted. And with that, we are adjourned for the day. All rise.
judges: CLIFTON, BENNETT, DESAI